**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Red Wing Shoe Company, Inc., Civil No. 02-257 (DWF/AJB)

Plaintiff,

v.

**MEMORANDUM OPINION AND ORDER**

B-JAYS USA, Inc.,

Defendant.

---

Edward F. Fox, Esq., and J. Aron Allen, Esq., Oppenheimer Wolff & Donnelly, 3400 Plaza VII Building, 45 South Seventh Street, Minneapolis, MN 55402, counsel for the Plaintiff.

Richard Gregory Wilson, Esq., and Mary Ruth Vasaly, Esq., Maslon Edelman Borman & Brand, 3300 Wlls Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, counsel for the Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on April 19, 2002, pursuant to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction. For the reasons set forth below, Defendant's motion is denied.

## Background

Plaintiff Red Wing Shoe Company, Inc. ("Red Wing") is a Minnesota corporation engaged in the manufacturing and distribution of footwear. Defendant B-JAYS USA, Inc. ("B-JAYS") is a New York corporation which distributes shoes and operates retail shoe stores in New York and New Jersey.

From 1995 until 1999, B-JAYS ordered numerous shoes from Red Wing, but the relationship between the parties was the ordinary one of supplier and distributor. In 1999,

APR 19 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

however, B-JAYS and Red Wing began discussing expanding Red Wing's line of specialized footwear. The parties jointly developed a line of "Special Make-Up Footwear," shoes created with color and fabric combinations intended to appeal to an urban market ("the shoes"). Development of the shoes was a cooperative venture. B-JAYS provided sketches and fabric/color suggestions to Red Wing here in Minnesota. Prototypes were manufactured overseas and shipped first to Minnesota for approval, then on to New York for approval.

The shoes were an enormous success, and from 1999 through March of 2000, B-JAYS purchased an increasing quantity of the shoes. Although most of these orders were placed through Red Wing's sales offices on the east coast, some of the orders were placed directly with Red Wing's Minnesota office.

In March of 2000, the parties entered into an agreement designating B-JAYS as the exclusive distributor of the shoes in the New York City area. The agreement contains a Minnesota choice-of-law provision.

As demand for the shoes grew, the manufacturers had difficulty keeping pace with the orders placed and shipments began to arrive late. B-JAYS also alleges that the quality of the shoes they received was not always satisfactory. On the other hand, Red Wing was growing concerned about B-JAYS's ability to cover the costs of the large orders it was placing. In June of 2000, several executives of B-JAYS flew to Minnesota to meet with officials from Red Wing to discuss supply issues as well as B-JAYS's financial situation. B-JAYS provided the agenda for that meeting. The agenda includes a number of items clearly unrelated to the dispute between the parties (*e.g.*, pricing, expansion of B-JAYS's sales territory, and "new ventures"). The B-JAYS executives stayed in Minnesota for two days.

Despite the meeting, the relationship between the parties continued to deteriorate, with B-JAYS complaining of late shipments, short shipments, billing errors, and product quality problems, and Red Wing was upset about late payments. Red Wing began withholding shipments because of the growing amount due and owing on shoes already delivered. Eventually, one of the checks tendered by B-JAYS was refused for insufficient funds. According to Red Wing, B-JAYS indicated that it did not have the money to pay the amounts due and it did not intend to pay any further on the outstanding invoices. Red Wing terminated the agreement.

On January 8, 2002, B-JAYS brought suit against Red Wing in New York, alleging that Red Wing breached the contract. On January 25, 2002, Red Wing instigated the present action alleging that B-JAYS breached the contract. The matter is currently before the Court on B-JAYS's motion to dismiss for lack of personal jurisdiction.

## Discussion

### 1. Standard of Review

In a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of setting forth a *prima facie* case of personal jurisdiction. *See Scullin Steel Co. v. National Ry. Utilization Corp.*, 676 F.2d 309 (8th Cir. 1982); *Tol-O-Matic, Inc. v. Proma Produkt-Und Marketing Gessellschaft, m.b.H.*, 690 F. Supp. 798, 800 (D. Minn. 1987). Despite the plaintiff's burden, the Court views all facts in the light most favorable to the plaintiff as the non-moving party. *See Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519 (8th Cir. 1996); *Radaszewski by Radaszewski v. Telecom Corp.*, 981 F.2d 305, 310 (8th Cir. 1992); *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384 (8th Cir. 1991).

**2. Personal Jurisdiction**

Typically, the test for whether a federal court may exercise personal jurisdiction over a defendant has two parts: (1) whether such jurisdiction is permissible under the forum state's long-arm statute and (2) whether such jurisdiction is compatible with the due process requirements of the Fifth and Fourteenth Amendments. Where, as here in Minnesota, the forum state's long-arm statute is co-extensive with Constitutional due process requirements, the two steps in the analysis merge. *See* Minn. Stat. § 543.19; *Dotmar, Inc. v. Niagra Fire Ins. Co.*, 533 N.W.2d 25, 29 (Minn. 1995) (describing the scope of Minnesota's long-arm statute). Constitutional due process requirements are satisfied where the defendant has "minimum contacts [with the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

In determining whether a non-resident defendant has sufficient contact with the forum state to justify an exercise of personal jurisdiction, the Court considers five factors: (1) the quantity of the defendant's contacts with the forum state; (2) the nature and quality of those contacts; (3) the nexus between the litigation and the contacts; (4) the interest of the state in providing a forum for its aggrieved resident; and (5) the relative convenience to the parties. *See Land-O-Nod Co. v. Bassett Furniture Industries, Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983). The first three of these factors are the most important. *Id.* In evaluating a defendant's contacts with the forum state, the Court must look at the totality of those contacts, rather than the significance of each contact individually. *See Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995).

Here, the Court determines that Red Wing has alleged sufficient contacts between B-JAYS and the State of Minnesota to support exercise of personal jurisdiction here. Although letters, phone calls, and faxes cannot, by themselves, support personal jurisdiction, *see Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651, 656 (8th Cir. 1982), they may be considered as part of the totality of circumstances which establish minimum contacts. *See Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3rd Cir. 1981). Similarly, a choice of law provision cannot alone support personal jurisdiction, *see Digi-Tel Holdings, Inc. v. Proteq Telecomm.*, 89 F.3d 519, 523 (8th Cir. 1996), but it may be evidence that a defendant purposely availed itself of the privilege of conducting activity in the forum state. *See Wessels, Arnold & Henderson v. National Medical Waste, Inc.*, 65 F.3d 1427, 1434 (8th Cir. 1995).

In the instant case, Red Wing has alleged that B-JAYS engaged in numerous and significant communications with Red Wing's Minnesota office, those communications running the gamut from the "merely fortuitous" placement of orders to the extensive collaboration on shoe design. The latter clearly demonstrates that B-JAYS was "endeavoring to foster a continuation of the business relationship" between the parties. *Northrup King Co.*, 51 F.3d at 1389. Moreover, several executives from B-JAYS traveled to Minnesota to engage in discussions about the nature and substance of that relationship. B-JAYS attempts to discount the significance of that trip by noting that the meeting involved discussion of the disputes between the parties. Typically, contacts made for the purposes of settlement negotiations should not be included in the minimum contacts calculus because to do so would undermine the public policy in favor of settlement of disputes. *See Digi-Tel Holdings, Inc.*, 89 F.3d at 524-25. In this instance, however, the meeting, held at the direction of B-JAYS, clearly was not limited to discussion of the parties' disputes, but,

rather, the meeting included discussions of all aspects of the on-going business relationship–including prospects for future product development and sales.

Viewed in their totality, the facts and circumstances of this case support the conclusion that personal jurisdiction over this Defendant is appropriate.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant B-JAYS USA, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 5) is **DENIED**.

Dated: April 19, 2002

DONOVAN W. FRANK
Judge of United States District Court